We will go to Coronavirus Reporter v. Apple, Inc. So I noticed that you're planning to split time. Did you request permission to do that? We did. And you got permission? I believe so. Well, I certainly never agreed to that permission. I apologize if there's any confusion. It's a very bad idea to split time, especially in a 10-minute argument, and it makes it difficult for us and difficult for you, and we need to approve it, and I don't believe we approved it, but go ahead if you really want to do it that way. Please, please record it. I'm splitting time. I think the confusion may have been we submitted an ECF request to split time. There's no actual motion that you would have approved. I think that was the confusion there, but I'm okay to waive any time to Attorney Matthews. That's fine with me as well, Your Honor. Go ahead. Good morning, and may it please the Court. This is an appeal of a motion to dismiss order that granted Apple's motion for plenary injunction. I represent the appellants, which are a number of apps, including Coronavirus Reporter. Coronavirus Reporter is a smartphone application, which is the brainchild of Dr. Roberts. He's a cardiologist who invented the gold standard test for heart attacks, which has been used to help millions of people. In February of 2020, before the pandemic hit this country, Apple determined that iPhone users should not be able to is the subject matter of our case. As it turns out, COVID is in large part a cardiovascular illness, something we did not realize in February of 2020, and Apple's conduct prevented a gifted cardiologist from helping in the early stages of the pandemic. In their briefing for today's hearing, Apple is saying that there isn't an antitrust injury in this case, that censorship is not an antitrust injury. We disagree, and now we're going to discuss how the complaint is written in order to to deal with that issue, to encompass the censorship, really, and this is the novel issue of our case, of free apps, free applications. And we argue that those free applications should be covered under the Sherman Act of 2019. So is your contention that any vetting of, that Apple has to be an all-commerce rule with regard to the Apple Store for apps, anybody who wants to put it on? Well, that kind of rule of reason analysis is not appropriate for a number of claims. However, no, we're saying that Apple needs to allow for other ways to load applications onto the App Store, because they're a monopolist in this regard. So they have a monopoly over what apps can be on their phone, and so we're saying, well, you have to open it up to other developers, which is what we're what we're representing here. So the answer to my question is yes. No, the answer to your question is, is that, you know, they can do vetting on their own store, but if they're going to do that, they also have to allow for loading of apps through other means, which is what our argument is. I see. So you're contending that they have to have a different, a different way, and is there somebody who would have hosted your, so your monopoly is about another App Store, as opposed to your own injury in not being able to post your apps? We certainly contend that there's a market for App Stores. This is an analysis that the court previously made in other cases. I believe in Epic, they said that there could have been a Disney App Store, hypothetically, which would be safer for children than the Apple App Store. So what Apple has done here is properly restrict commerce on their device, on the smartphone, to just their own App Store. And that's the, that's really the basis of our tying claim, which is interestingly not really addressed by the court's order. I'd like to talk about that a little bit, if I may. So we made a tying claim in this case. The court has grouped all of our antitrust claims into the one denial of our, the one granting of the motion to dismiss. And so what happens is, is that it ignores all of the analysis that's necessary for the tying claim to be, to be heard, to be seen. And it doesn't really address that issue at all. So the court has said... So the court, the reasons it gave for saying no tying claim was a failure to allege two separate and distinct products. What are the two separate and distinct products that are tied in this case? The iPhone itself and the App Store are the two separate claim things that are tied in this case. And so what we're saying is, is that there's a... And where is that in the complaint, if I may? I'm not sure, but I believe it is in our briefing. Well, that's not very helpful. I apologize. Counsel, let me ask you a question, if I may, as a judge. I'm having trouble understanding the antitrust injury here. So if Apple only permitted the sale of apps at the Apple, the App Store that were developed by Apple or its own subsidiaries and excluded third persons from having their apps in the Apple Store, I could understand an antitrust injury. But here I thought that Apple did allow third persons to sell their apps. So I'm a superintending of what was going to be on the shelves for sale. Yes, Your Honor. So the problem arises here that Apple has 65% according to their current press releases of the smartphone market. And so by restricting trade, it creates a bottleneck for developers to the extent that all competition regarding apps, separate apps, is prevented or completely removed by Apple's saying, well, these apps need to be on the store. Well, it's not completely removed. There's the other 35% of the market. For the Android phone? Is that what you're saying, Your Honor? The claim is that the 65% is Apple's monopolist to control over the smartphone market. That's the threshold to reach that level. So the way that this used to work, and I know we can all remember this, is that there used to be stores that sold software. There used to be other ways to get software onto devices. There used to be you could download a piece of software off the Internet. My programmer indicates to me that it would be as simple as flipping a switch on and off in order to get an open invitation for people to download the coronavirus reporter app onto the iPhone. I also think that the conversation we had earlier is really important, or the conversation I started with, which is that Apple denied this app, claiming that we didn't have the medical credentials to move forward with coronavirus reporter. Now, the few things that we didn't know back then is that coronavirus is a cardiovascular illness, and they denied Dr. Roberts saying that his medical record was not substantial enough in order to move forward with the application. Now, Apple is not a doctor in this circumstance, and Apple did later on create a COVID app of their own in direct competition with Dr. Roberts' app. And so what we're looking at down the line is the denial of applications by Apple, the taking of the idea for those applications, and then the creating of their own, which is also monopolistic and injury to trade generally. And so it's really a matter of the overall approach that Apple is taking regarding these issues, basically that they have tied our only way to get software to the phone to the phone itself. There's no other way around that at this point. So that's the claim as it currently sits. In terms of the market analysis, which the court also, I think, got wrong on this issue, we were a little bit confused by the overall picture here. We tried to understand what their reasoning was on our markets, but we think he got it wrong, particularly when he ordered that any market involving apps must have transactions as the product. We're going to disagree with that, and our market for apps is more like the market for books in this analysis. So applications like books are numerous. This is an app store. It's called that, and it's clearly bordered, right? We have it bordered in the name of the store where the product is sold in both Apple and Android markets, and that's what we're saying. There's basically only two at this point. These are the replacement for the software stores. Counsel, let me ask you a question. Let's see your bookstore analogy. Am I understanding you to be saying that any person who has an app has a right to have their app sold through the Apple app store, and the Apple has to accept all comers? No, Your Honor, and I apologize if that's where the court thought that we were going with this. What we're saying is there needs to be an allowance for other ways to get software onto the platform, as has historically been the case with all software companies. You used to be able to go over to Best Buy and buy a box that had a piece of software in it on a disk and download it into your computer. You can't do that anymore because Apple has completely tied the only way to get software onto their phones to the phone itself, which is our main tying argument, and it's an antitrust injury. I presume that you could have a website and have people access your functionality that way. Correct, Your Honor, and I think that that's really what we're saying is that when Apple rejected our app and Dr. Roberts wanted to help with the coronavirus issue, and originally and throughout the entirety of this, he was putting this out for free with the intention of getting cardiovascular data on the virus that could have been helpful. Okay, and you couldn't do that just by having a website? Correct. It's not allowed to be loaded onto your phone at that point. It wouldn't become an application on the phone, and it wouldn't have access. Right. It doesn't have to be on the phone, right? You could do it from your laptop. Or, in fact, on your phone you could probably at least input information if you Google this website. So you just wanted or the allowed to do was to use a special functionality that an app has as opposed to a website. Is that correct? Yes, the difficulty is the functionality of the phone because the phone itself is a number of things besides a phone. It's a GPS, which would allow you to track the symptoms and say where you actually were to confirm that the data is coming from the actual correct point, which would be a real problem for the coronavirus app. And it would also allow you to use the regular functionality of your phone and put your symptoms in as you go. It would allow people to access it on their phone more conveniently and easily. So are you saying that all comers need to be able to use the functionality of the phone? Is that the argument? I'm having trouble pinning down what your argument is. The argument is that Apple can't restrict the App Store to being the only place to buy apps on the smartphone. So all comers, anyone who does an app should be able to access the functionality of an iPhone even if they can't get into the App Store. Is that what you're saying? Well, I think this question is a very interesting one. The basic idea is that this is the antifrust injury that we're talking about. Because it's so... It's difficult to comprehend what actual competition would look like on the App Store because of the way that it's been for so long. And we've come used to it, that the iPhone and the App Store are combined together, it's in our pockets, this is how these things work. But the reality is that it should be working a little bit more like an old software store where people can compete, different developers can compete, in order to put their applications on the store and do what they need to do, including creating other app stores or websites. So in a sentence, what is the market that we're looking at? Your complaint has many descriptions. Sure. Can you give us a sentence? Absolutely. So a market is really just the item and then the substitutes for that item. So we have a market for apps, and we've said this before, like a market for books. Our market encompasses all of the apps that are sold, and that's where the market arrives. It's clear boundaries, that's it. We also have a market for phones, and then there's the other issue we haven't discussed, which is the developer issue, which is that Apple sells, basically, onloading software to developers for $99 a year. There's only one real other competitor to that, and that's Google, and they're $29 a year. We plead that into our complaint as well. So your first version is the apps themselves, although you said earlier that that wasn't it. It was the methodology of putting the app on the iPhone. Well, we would argue that there would be a market for application stores that have been completely eliminated by Apple's conduct in this case. You can't do it, simply, is the real issue. You're not an Apple store. Well, you're not allowed to bring anything that would sell an application on the iPhone at all. It's completely restricted by their software, and that's the main contention. Okay, it's very complicated. Your time is up. Thank you for your question. I recognize that. Thank you. Thank you for your flexibility with the argument. Judge Berzon, I have one question. Judge Gold has a question. Sure. My question is this, because you used a bookstore analogy. Imagine that you have a bookstore, you're running the bookstore, and you own it, and I've written a book about some subjects, which is interesting to me, but which you as the owner of the bookstore feel should have, would have no wide enough public interest to justify taking up your space. If I tender my book to you in your bookstore, are you required to put it on your bookstore shelf, or is that one of those cases where you could refuse to deal with me by just declining? This analogy is inapplicable to this case, and the reason why is because if there was only one bookstore that exists, one book publisher that existed in the world, then yes, the restriction would be an issue that should be determined by the Sherman Act. It's a violation of the Sherman Act if you're running the only bookstore and you're telling people you can only sell certain books, and that's really what this circumstance is. But they're not running the only bookstore. They're running the only bookstore that's accessible on their phone, which is 65%, which is well over the monopoly control of the phone market. Okay. All right. Thank you very much. Thank you. Good morning, Your Honors, and may it please the Court, Julian Kleinbrodt on behalf of the defendant, Apple Inc. What we have just heard from counsel is a further evolution of the arguments in this case. I would ask the Court to look at page 2744 of the excerpts of record. This was the proposed injunction that the plaintiff submitted in this case, and they asked the district court to enjoin Apple from blocking, rejecting, or banning any App Store third-party developer app submission for any reason, subject to extremely limited circumstances. Frankly, the arguments that we have had today about antitrust injury are not those that were largely advanced below. I understand that there are a lot of issues here and that they continue to evolve, so let me try to clarify and streamline this appeal into the two issues that really matter, because the district court, in dismissing all of plaintiff's antitrust claims, focused on two foundational defects, market definition and antitrust injury. And defining the market is the foundational step in an antitrust case. It creates the framework for how we evaluate all of the competitive considerations that follow, because an antitrust case, at its heart, is about the defendant's power in a market and the challenge conducts affects in a market. Suppose, I don't know if he's correct, but suppose the plaintiff was correct that Apple's 65% share of the iPhone market was itself a monopoly for Section 1 purposes. Your Honor, I think this actually points up the importance of defining the markets with clarity, because what counsel is referring to there is a device market. There is no challenge restraint in a device market. It is not a relevant market for this case. He says it is, so that's why I'm asking you, is it relevant? It is not relevant because, as this Court's questioning was indicating, the restraints that are challenged here apply to app distribution, that is the transactions that take place on the App Store. Apple isn't alleged to have done anything regarding the sale of phones themselves that is challenged in this case. And frankly, Your Honor, Judge Chen wrote a fairly careful and extensive opinion in which he rejected the plaintiff's proposed markets for three separate and independently sufficient reasons, that they were ill-defined, they were unsupported by sufficient factual allegations, and that they conflicted with the alleged commercial reality. Each of those grounds is sufficient to support the dismissal of all of plaintiff's antitrust claims. And the plaintiffs today, and not in their briefing either, have simply been unable to identify allegations in their complaints that demonstrate any error in any of Judge Chen's conclusions, much less all of them. I also want to turn to antitrust injury, and I think this Court was zeroing in on a fundamental problem with the plaintiff's theory here. First, conduct can often benefit competition, even if it does not work to the advantage of a particular business, or in this case, developer. And that is fundamentally why we have the antitrust injury requirement to begin with, to ensure that the antitrust laws are being used only to challenge conduct that harms competition, as opposed to merely a single competitor. And again, this Court's law is settled in this regard. A plaintiff cannot clear this foundational hurdle based on merely conclusory language about the elimination of competition or an improper purpose. And as Judge Chen found, that is all that has been alleged here. I would like, again, to refer the Court to the record in this case, because in the entity's opening brief at page 14, they purported to cite the paragraphs of the complaint that they contended alleged antitrust injury. Those are paragraphs 36, 53, 81, 173, 174, 179, and 200 of the complaint. And each of these is a mere threadbare recital of harm at most to a small group of developers. Paragraph 36, for example, is a recitation of a supposed, quote, international consensus that the App Store harms competition and innovation, end quote. Paragraph 53 contains similarly conclusory language about Apple intending to harm particular developers with no allegations, conclusory or not, of harm to competition. Paragraph 81 alleges that rejecting the coronavirus reporter app from the App Store, quote, represented damage to an entire market of COVID startups. It does not provide elaboration, and plaintiffs have disavowed reliance on any market for COVID startups. And paragraphs 173, 174, 179, and 200 are more of the same. And a fundamental problem with the theory here, as Judge Chen found in his order, and this is at page 34 of the excerpts of record, is that plaintiffs are fundamentally complaining that Apple has a duty to list their apps on the App Store under the terms they want. That is not what the law says, and as this court held in a recent opinion in Dreamtime, the refusal to deal with a particular customer is not necessarily anti-competitive outside of extremely limited circumstances that are not alleged here. And as a result, it does not produce antitrust injury from the mere fact that a platform declines to deal with a particular customer. Your Honors, I also want to conclude with a brief word about the district court's ultimate ruling in this case. I have a slightly irrelevant, perhaps, question, but I'm curious. What's a notarization stamp? Your Honor, frankly, I'm not sure what it is. There is a process that can be used in app distribution referred to notarization, which is a technical process in which Apple has essentially an electronic signature that can identify a particular piece of software as having been approved. But the problem is it's not a product, and Judge Chen zeroed in on this, for the alleged notary stamps market. Apple is not buying and selling notary stamps. Notarization is simply part of the technology that is used on the App Store in order to distribute apps. It's not a standalone product that could form the basis for a market, much less a single brand one, as is alleged here. And with the many issues that have been discussed today and the many independent bases that support Judge Chen's ruling, it highlights a challenge in this appeal that the plaintiffs have been unable to meet, which is that they have not been able to identify any amendment that could cure the many deficiencies identified by the district court. There are several independent grounds to affirm the district court's market definition findings, as well as several independent grounds to affirm the district court's findings with regard to antitrust injury. And plaintiffs' inability to identify a curative amendment is not for lack of time, opportunity, or effort. The operative complaint here was the seventh, the product of at least three substantive amendments. And plaintiffs told the district court- I thought there were several different lawsuits in different places. There were, Your Honor. The procedural history here is a bit tortuous. The parties that ultimately became the plaintiffs in some fashion began two separate lawsuits, one in the District of Maine, one in the District of New Hampshire. Some of those were transferred, some were voluntarily dismissed, but eventually they coalesced into the case that's been appealed here. And plaintiffs admit that they had at least three substantive amendments to their complaint. And moreover, they told the district court that the operative complaint was their best effort. They alleged in the complaint- this is at the excerpt of record at page 957- that they and their counsel had worked tirelessly on the claim theory. And in full view of Apple's arguments, they told the district court that this was their best theory, quote, from the supplemental excerpts of record at page 14, but we believe that is our best theory, that they are a monopsony buyer, even though it's largely free and hypothetical, end quote. Plaintiffs also submitted two putative amendments below, both of which Judge Chen rejected. And in fact, the latter of those, which was a complaint that their counsel filed in Florida, also against Apple, and it was attached to their motions for reconsideration here, conceded the futility of litigating their claims under this court's precedent. This is from the excerpts of record at page 208, quote, plaintiff does not need to apply to join the DPLA- that's Apple's developer program license agreement- which would simply move this dispute to the Ninth Circuit and prevent redress from ever occurring, end quote. But a remand would prejudice Apple, Your Honors. As Your Honor has noted, the case here had a tortuous history. Apple had to move to dismiss six times across three venues. Apple had to endure two frivolous motions for preliminary injunction, a frivolous motion for sanctions, and frankly, an unending barrage of improper filings, which is why we have- There are two pending antitrust cases involving Apple in the Ninth Circuit now. Is that right? There is one case, Your Honor, the Epic v. Apple appeal. Wasn't there another one? The Cameron case, which was a developer class action settled in the district court earlier. Okay. So one involved developers and the other one involves App Store competitors? Yes, and I should actually say, Your Honor, there is another appeal, the Sarek case. Oh, I was thinking of that. Yeah, that is a case that concerns the statute of limitations argument only. That case is brought by a single developer of an allegedly competing App Store called Cydia. The Epic case is brought by a one-game developer. And then, as I mentioned, there were two class actions in the Northern District of California. The Cameron case, which is a putative class action on behalf of developers, and the Pepper case, which is a putative class action on behalf of consumers and class certification recipients. Would the developer cases cover not the issues in this case, but apply to the developers in this case? To the extent that the developers here would sell products on the App Store. But they're free is what they're saying there. Right. So the Cameron class limited its putative class definition to apps that were sold for a positive price. That is not free apps. And so to the extent these developers have actions in that. That free app developers would be precluded from bringing a properly framed case. It just isn't one. That's correct, Your Honor. We don't have any categorical position that free apps cannot constitute some part of the market or that developers of free apps are somehow categorically precluded from asserting antitrust theories. The problem here is that none of the markets, none of which are for free apps exclusively, have been properly defined. And the theories and allegations of antitrust injury here are insufficient under this court's precedent. And I see my time has expired, so I simply ask the district court. One last question. Do you support Judge Chin's conclusion that any marketer has to be a marketer in transactions? Well, it depends on when we say any market here. The fundamental restraint that is being challenged, I think, at the core of this, is about distribution of apps on the app store between developers and consumers. And in that context, what you are dealing with, as alleged in the complaint, is a two-sided market in which the app store is a platform, also as alleged in the complaint. And the Supreme Court in American Express teaches us that in a two-sided market involving a two-sided transaction platform, a single market for transactions is what should be defined. That does not necessarily preclude in a different case, for example, that would involve the phones themselves, a different market for the devices. But I do believe that Judge Chin was correct in ruling that for a restraint on the distribution and the transactions on the app store, a single two-sided transaction market was appropriate. Do my colleagues have any questions? No. Thank you, Your Honors. Thank you. One minute and rebuttal. I'm going to handle the rebuttal if that's okay with the Court. I'm sorry, but I can't hear you. Oh, I apologize. Dr. Isaacs has indicated that he would like to do the rebuttal. Go ahead. Thank you, Your Honor. The controlling law here is under brown shoe that markets are a fact-finding issue for the jury to determine. That is the only exception we're aware of that Apple raised is Hicks, which was cited in Pistachio by the District Judge for an artificially narrow market. And our argument, there is nothing artificial about it. It's something that the Senate and 30 other countries are struggling to enforce. The app market as we define it, the institutional app market is the institutional value of a book. It's not the app store. And there is not a healthy competition like there is book distributors like Penguin, Random House. There's just only one Penguin or Random House, and it's Apple. Maybe Google. Maybe there's two. That's less than 20%. So the work product value of an app that's sold to an institution is our product. What does institution mean here? We meant retail institution, wholesale. And that word was confusing, but it's not wrong. And it's still plausible that a jury and experts can put that together. So it's a retail institution like book publishers like Penguin, Random House. The app store itself is not one of our markets specifically because it's only in our tying claim. And tying under Hicks, under Apple's own law that they provided, their own citation, Hicks says you do not need a detailed product market for tying. And our tying, to answer the court's question several minutes ago, in count five of the FAC, we've gone through it 30 times. It is flawless, we submit. It is tying the app, the iPhone to the app store, or sorry, the tied product is the app store. And those are both clearly defined with substitutes. And the definition of a market is all reasonable substitutes. The iPhone, the LG, Samsung are in our third page of our FAC. And the app store and Google Play are the only substitutes. We even mentioned the old one, the Microsoft store, that doesn't exist anymore. So under the controlling law here, Hicks is the only possible exception to allow 12B6. So what's tied to what? The iPhone is a device. And this is where that opposing counsel has cited Microsoft. But it clearly contradicts what they told your court in Epic, that the Apple sells devices. Tim Cook said this under testimony. So the tying product is the iPhone. And we've defined all substitutes. The tied product is the app store. And we've defined all substitutes. And that's one of our claims. Again, there's two others, the user-based access and then the institutional value at whole. So we have three different angles to look at this. And it's certainly Amex transactions do not apply here. To say that the product must be a transaction just throws away all bookstores, all printing presses. It is that Amex is just a very extreme case for transaction platforms. And we don't believe the court can conclude that the institutional app market product is transactions. That's like saying the books are transactions. These are work products by authors and developers. They are not transactions. There's just no reasonable way to say that. Okay. Thank you very much. We'll give you some extra time. Thank you. And the case of coronavirus reporter versus Apple is submitted.
judges: GOULD, BERZON, IKUTA